AMY K. FISHER
   Amy.Fisher@icemiller.com
BONNIE L. GALLIVAN
   Bonnie.Gallivan@icemiller.com
KATHERINE A. WINCHESTER
   Katherine.Winchester@icemiller.com
AUDRA J. FERGUSON-ALLEN
   Audra.Ferguson-Allen@icemiller.com
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN  46281-0200
Telephone:  317-236-2100
Facsimile:   317-236-2219

Attorneys for Defendants
ASTRAZENECA PHARMACEUTICALS LP,
ASTRAZENECA LP, and MCKESSON
CORPORATION

[Additional counsel listed below]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: NEXIUM (ESOMEPRAZOLE) PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No.: 12-ml-2404 DSF (SSx)<br><br>**DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY BAL, M.D., J.D., M.B.A.**<br><br>Judge:  Hon. Dale S. Fischer<br>Courtroom: 840 - Roybal |

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................1

II. ARGUMENT ........................................................................................2

    A. Plaintiffs' Response Does Not Demonstrate That Dr. Bal Is Qualified To Opine About Whether Nexium Can Cause OP. ..............2

    B. Plaintiffs' Response Highlights The Lack of Known Mechanism of Action ...................................................................................................5

    C. Plaintiffs' Response Confirms That Dr. Bal Is Testifying As To An "Association" Only. As Such, His Testimony Is Unhelpful.. ..........7

    D. Plaintiffs' Response Fails To Address The Fundamental Underlying Analytical Gaps Which Render Dr. Bal's Opinion Unreliable. ..............................................................................................9

III. CONCLUSION ...................................................................................12

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                           PAGE(S)

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) ...................1

*Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) ........................................................................................................................12

*Mukhtar v. Cal. State Univ.*, 299 F.3d 1053 (9th Cir. 2002)...................................1

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ........................................9

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) ........................................................7

*Schudel v. Gen. Elec. Co.*, 120 F.3d 991 (9th Cir. 1997)......................................11

*Stanley v. Novartis Pharm. Corp.*, No. 11-cv-03191, 2014 WL 1316217 (C.D. Cal. Apr. 2, 2014).....................................................................................1, 4

*In re Avandia*, No. 07-md-01871, 2011 WL 13576 (E.D. Pa. Jan. 4, 2011) ...........4

*Tucker v. SmithKline Beecham Corp.*, 701 F. Supp. 2d 1040 (S.D. Ind. 2010) .....................................................................................................4, 10, 11

*Mascarenas v. Miles, Inc.*, 986 F. Supp. 582 (W.D. Mo. 1997)...............................3

**STATUTES**                                                                                                PAGE(S)

FED. R. EVID. 702................................................................................................*passim*

21 C.F.R. § 201.57(e) ..............................................................................................10

**OTHER**                                                                                                   PAGE(S)

Ensrud K.E., et al., *Low Fractional Calcium Absorption Increases the Risk for Hip Fracture in Women with Low Calcium Intake*, ANNALS INT'L MED. 2000; 132 (5): 345-53........................................................................................6

Hansen K.E., *Do Proton Pump Inhibitors decrease calcium absorption?*, J. BONE MINERAL RES. 2010; 25 (12): 2510-19........................................................6

Wright M.J., et al., *Inhibiting gastric acid production does not affect intestinal calcium absorption in young, healthy individuals: a*

ii

DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO
EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY
BAL, M.D., J.D., M.B.A.
Case No. 12-ml-2404 DSF (SSx)

*randomized, crossover, controlled clinical* trial, J. BONE MINER. RES. 2010; 25 (10): 2205-11 .................................................................................... 6

**EXHIBITS**

Exhibit A: Excerpts from Transcript, Feb. 19, 2014 *Nexium*® Dep. Dr. Bal

## I. INTRODUCTION

The central argument in Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Exclude Plaintiffs' General Causation Expert B. Sonny Bal, M.D., J.D., M.B.A. (Master Dkt. 287) (hereinafter "Response") is that their expert Dr. Bal's opinions may be shaky and not peer reviewed, but the proper recourse for this Court is to allow the jury to decide what weight to give his testimony, rather than exclude it altogether. *Daubert* and the cases interpreting it, including the Ninth Circuit's recent *en banc* opinion in *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463-64 (9th Cir. 2014), make clear that the district court is obligated to evaluate and exclude unreliable, irrelevant expert testimony through its gatekeeping function.

> A trial court's "gatekeeping" obligation to admit only expert testimony that is both reliable and relevant is especially important "considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony."

*Stanley v. Novartis Pharm. Corp.*, No. 11-cv-03191, 2014 WL 1316217, *3 (C.D. Cal. Apr. 2, 2014) (quoting *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002)). It is improper to simply turn such unreliable evidence over to the jury to weigh.

Accordingly, the Court should answer all three questions presented in Section III of Defendants' opening brief in the negative:

1. Dr. Bal is unqualified to opine that Nexium® can cause osteoporosis, osteopenia and osteoporotic fractures (collectively "OP")[1];

---

[1] Plaintiffs assert as a fact that several studies have been published which link PPI use and OP. (Resp. at pp. 2-3; nn.2-4; pp. 13-14.) As discussed in Defendants' Motion to Strike filed contemporaneously herewith (Master Dkt. 312), Plaintiffs' reference to

2. Dr. Bal's opinion that Nexium® is merely "associated" with OP is not "helpful" when the issue is causation; and,

3. Dr. Bal's opinion is not reliable because it is litigation-driven and there is too great an analytical gap between the data he relies upon and his conclusions.

## II.   ARGUMENT

### A.   Plaintiffs' Response Does Not Demonstrate That Dr. Bal Is Qualified To Opine About Whether Nexium Can Cause OP.

Dr. Bal[2] is an orthopedic surgeon who specializes in the repair and replacement of cartilage, not bone. **Exh. A** (Bal Dep. 7:6-13.) To the extent that he deals with bones, his practice consists of surgically repairing them. (*Id.* at 108:10-15.) While AstraZeneca does not dispute that he may have "exceptional familiarity and expertise with . . . bone," this expertise has nothing to do with calcium absorption in the gastrointestinal tract or whether treatment with Nexium can inhibit this absorption so as to lead to reduced bone mineral density and OP. Dr. Bal professes no particular expertise in this core issue. Noticeably absent in Plaintiffs' Response regarding his qualifications (Resp. at p. 4, l. 20 – p. 5, l. 6, p. 8, ll. 12-15), are citations to Dr. Bal's own testimony or his CV. That comes as no surprise; Dr. Bal testified that: "When people come to us with a broken leg, they

---

studies their expert never reviewed or relied upon is improper. Regardless, these studies do not establish causation as a "fact." Defendants' expert authored one of the studies and opines that there is insufficient evidence to conclude that PPIs play a causal role in OP. (Master Dkt. 255-4, Targownik Rpt., p. 9.)

[2] The cited portions of Dr. Bal's February 19, 2014 deposition transcript in this matter ("Bal Dep.") are attached as **Exhibit A** to the Declaration of Katherine A. Winchester in Support of Defendants' Reply in Further Support of Motion to Exclude Plaintiffs' General Causation Expert B. Sonny Bal, M.D., J.D., M.B.A.

2
DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY BAL, M.D., J.D., M.B.A.
Case No. 12-ml-2404 DSF (SSx)

come to us not to review literature but to fix the broken leg." **Exh. A** (Bal Dep. 108:13-15.)

Plaintiffs sole support for Dr. Bal's qualifications is that (1) he is an orthopedic surgeon who has operated on patients some of whom have OP and (2) he has read some medical literature discussing the relationship between PPI's and OP. On this basis alone, they assert that he is "exceptionally" qualified to testify as to whether treatment with Nexium can cause OP. They also argue that Dr. Bal's simultaneous involvement in the *Fosamax* litigation in which he expressed scientific positions that contradict his core opinion in this case should not taint his qualifications here. Neither argument should persuade this Court to find Dr. Bal qualified on the issue at hand – whether Nexium® can **cause** OP.

Moreover, the fact – standing alone – that Dr. Bal is a medical doctor does not qualify him to testify here. As discussed in Defendants' opening brief, the question is whether the testimony falls within the expert's area of **relevant experience**. (*See* Master Dkt. 255, p. 13 and cases cited therein.) Because Dr. Bal is not opining on surgical technique or even whether surgery is needed, he is not qualified because his experience is not relevant. Dr. Bal bases his opinion on his reading of epidemiologic scientific literature and their posited mechanisms of action relating to calcium homeostasis. His clinical work as a surgeon does not lend any particular expertise to reliably undertake this expert analysis and reach a relevant, reliable opinion based upon them. *Mascarenas v. Miles, Inc.*, 986 F. Supp. 582, 593 (W.D. Mo. 1997) (cancer surgeon not an expert in cancer causation).

Plaintiffs' cited cases do not provide to the contrary. First, neither *Stanley* nor *Tucker* address the issue. In *Stanley*, the plaintiff was a cancer patient who claimed that her osteonecrosis was caused by bisphosphonate use. 2014 WL

3

DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO
EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY
BAL, M.D., J.D., M.B.A.
Case No. 12-ml-2404 DSF (SSx)

1316217 at *8. Her expert dentist was a specialist in osteonecrosis in cancer patients, had published on osteonecrosis caused by bisphosphonates and had reviewed all of her medical and dental records and the depositions of all of the treating physicians. *Id.* In *Tucker v. SmithKline Beecham Corp.*, the doctor expert's credentials were "undisputed." 701 F. Supp. 2d 1040, 1047 (S.D. Ind. 2010). Regardless, the expert psychiatrist, who testified about whether treatment with an anti-depressant can increase the risk of suicide, was also a neuropsychopharmacologist (specialist in how the brain reacts to medicine) and he had "written many peer-reviewed medical journal articles concerning the SSRI class of drugs, including [the drug at issue], and the risks and benefits of those drugs." *Id.* Dr. Bal, having never studied or published on PPIs generally or Nexium® specifically, is not in the same position. And, he professes no specialty in how medicine impacts any part of the body.

Finally, *In re Avandia*, is distinguishable for two reasons. First, the court noted that the movant "did not elaborate on the challenge" that as a cardiologist the expert was not particularly qualified to analyze and draw conclusions from epidemiologic research. No. 07-md-01871, 2011 WL 13576, *10 (E.D. Pa. Jan. 4, 2011). Second, the court recognized that the doctor was a professor and researcher specializing in "lipoprotein metabolism" including "apoB as a marker for vascular disease" – the precise issue in the litigation. *Id.* The same does not hold true here.

Next, Plaintiffs argue that it would be "prejudicial" to hold Dr. Bal's very recent testimony in the *Fosamax* litigation against him. (Resp. at p. 10, l. 28.) The *Fosamax* deposition took place 1 month **before** his deposition here and less than two months **after** he submitted his Rule 26(A) Report in this case. As such, his testimony in *Fosamax* came during the height of his duties in this litigation. When deposed in *Fosamax*, (at best) he forgot the opinions expressed in his *Nexium*

4
DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO
EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY
BAL, M.D., J.D., M.B.A.
Case No. 12-ml-2404 DSF (SSx)

expert report. When deposed in *Nexium*, Dr. Bal could recall little about his prior testimony. Notably, the deposition testimony AstraZeneca cites here, was not focused on "a particular Fosamax plaintiff" or other case-specific details. The testimony instead involved the **science** underlying his fracture opinion in *Fosamax* as it relates to the science underlying his opinion here. Dr. Bal was unable or unwilling to discuss those issues.

It is axiomatic that one cannot be deemed an "expert" if his recall of the relevant subject matter is that limited. In *Fosamax*, he was defending a pharmaceutical manufacturer. Here he is on the other side. Accordingly, Dr. Bal's inability to recall core concepts from one month to the next shows either that the issues discussed in the deposition are not those he addresses in his ordinary clinical practice or his testimony is influenced by litigation. Either results in his exclusion.

Moreover, Dr. Bal alleges that Nexium® "may exert a direct action on skeletal cells called osteoclasts . . . leading to altered bone turnover." (Resp. at p. 15, ll. 1-4.) This is precisely how bisphosphonates like Fosamax® work. Bisphosphonates slow or stop osteoclasts from resorbing bone and releasing calcium. (*See, e.g.*, *id.* at pp. 9-10.) In *Fosamax*, Dr. Bal says a direct action on osteoclasts cannot cause fracture. Here he says it does.

**B.   Plaintiffs' Response Highlights The Lack of Known Mechanism of Action.**

Dr. Bal has not identified **any** scientific basis for his opinion that **Nexium® use** "leads to poor calcium intake." (*Id.* at p. 9.) Yet, he opines that this is the plausible mechanism by which Nexium® causes the types of injuries alleged by Plaintiffs here. In fact, he never even tried to research the proposition. **Exh. A** (Bal Dep. 133:5-9.)

5
DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO
EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY
BAL, M.D., J.D., M.B.A.
Case No. 12-ml-2404 DSF (SSx)

If he had, he might have located (as Defendants' experts did) the independent clinical studies *Hansen 2010*[3] and *Wright 2010*[4] which both found that acid suppressors (including Nexium®) do not reduce calcium absorption. (Master Dkt. 255-4, Targownik Rpt. at p. 7) ("multiple recent studies evaluating calcium absorption [and PPI use] have not shown any deleterious effect on calcium absorption, except when evaluating solely the absorption of calcium carbonate in the non-fed state."); (Master Dkt. 256-5, Bikle Rpt. at p. 16) ("inhibiting calcium absorption by blocking gastric acid secretion and thus reducing the solubilization of calcium salts, has not been shown to reduce intestinal calcium absorption when put to the test in humans").[5]  Dr. Bal was unfamiliar with these studies. **Exh. A** (Bal Dep. 139:2-14.)  Rather, he admitted at his deposition that *Ensrud*[6] (the only calcium absorption study he reviewed) did not study acid suppressing medication at all.  (*Id*. at 136:1-11.)   Rather, it simply found that women with low calcium intake and absorption rates have more hip fractures.  (*Id.*)   It did not study **why** those women had low calcium absorption.  (*Id.*)

---

[3] Hansen K.E., et al., *Do Proton Pump Inhibitors decrease calcium absorption?*, J. BONE MINER. RES. 2010; 25 (12): 2510-19.

[4] Wright M.J., et al., *Inhibiting gastric acid production does not affect intestinal calcium absorption in young, healthy individuals: a randomized, crossover, controlled clinical trial*, J. BONE MINER. RES. 2010; 25 (10): 2205-11.

[5] Plaintiffs confuse two concepts.  (Resp. at p. 19.)  It is accepted that decreased calcium uptake can lead to osteoporosis.  That is not at issue here.  What **is** at issue is whether Nexium® can decrease calcium uptake.  Plaintiffs assert incorrectly that "Defendants' experts offer no opinion or evidence to refute that Nexium® or any other PPI can cause a decrease in calcium uptake."  (*Id.*)  As discussed herein, Defendants' experts' reports disclose and discuss *Wright* and *Hansen* both which disprove the proposition that Nexium® causes decreased calcium uptake (which then could cause osteoporosis).

[6] Ensrud K.E., *Low Fractional Calcium Absorption Increases the Risk for Hip Fracture in Women with Low Calcium Intake*, ANNALS INT'L MED. 2000; 132 (5): 345-53.

6
DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY BAL, M.D., J.D., M.B.A.
Case No.  12-ml-2404 DSF (SSx)

Regardless, as discussed above, Dr. Bal's opinion that Nexium® reduces calcium intake – is not his only speculated method by which he believes Nexium® use may be "causally associated" with OP.  Rather, Dr. Bal **also** states that Nexium® (like Fosamax®) has a direct effect on osteoclasts which, if true, would protect bone by preserving calcium in bone.  Thus, his opinion that reduced bone turnover from Nexium® use is bad for bone is antithetical to his *Fosamax* opinion.

### C.  Plaintiffs' Response Confirms That Dr. Bal Is Testifying As To An "Association" Only.  As Such, His Testimony Is Unhelpful.

Plaintiffs affirm that Dr. Bal's opinion is that Nexium® is "causally associated" with OP – not that Nexium® **causes** OP. (Resp. at pp. 1, 12.)  This is consistent with his expert report and his necessary concession that his report contained a full and complete statement of all of his opinions in this case.  Accordingly, his "association"-only opinion is "unhelpful."

Plaintiffs do not argue against the established proposition that "association" does not equal causation.  (Master Dkt. 255, p. 17; *see also generally* Resp.)  In fact, *In re TMI Litig.*, cited by Plaintiffs, reiterates that "Association is a term of art in epidemiology. It is defined as '[t]he degree of statistical dependence between two or more events or variables. . . Association does not necessarily imply a causal relationship.'"  193 F.3d 613, 710 n.159 (3d Cir. 1999).  Rather, they argue that causation may be "impl[ied]" from association studies and that such studies "add[] weight." (Resp. at p. 13, lines 11, 15.)  However, they admit that no inference can be drawn from associational studies alone.  Rather, association studies must be "[c]ombined with accepted mechanisms of action, and corroborating evidence from other scientific studies, when combined with other supportive data." (*Id.*)[7]   And,

---

[7] Plaintiffs assert that Defendants' experts require "black and white," "gold standard"

1  Plaintiffs do not have any such corroborating evidence.  Plaintiffs do not offer
2  "accepted" mechanisms of action supported by any studies.  **Exh. A** (Bal Dep.
3  118:24-119:5.)  They rely upon no other clinical studies or supportive data.
4  Accordingly, Dr. Bal's association-only opinion is not "helpful" to the only issue
5  presented here – whether Nexium® can cause OP.

6  Plaintiffs' Response highlights this dichotomy between evidence of
7  association versus causation when it discusses a study conducted by Targownik in
8  2008.  (Resp. at p. 3.)  Plaintiffs assert that this association study establishes that
9  Nexium® use increases the risk of hip fracture.  **Dr. Targownik submitted an**
10 **expert report in this case that undermines Plaintiffs' lay interpretation of her**
11 **work.**[8]  She conducted the study, and she does not believe that the scientific
12  evidence (including her multiple studies) supports that Nexium® use causes OP -
13  even though her 2008 study found an **association** between the two events.  (Master
14  Dkt. 255-4, Targownik Rpt.)  As Dr. Targownik explains: receiving the morning
15  newspaper is highly associated with the sun rising.  However, the newspaper
16  delivery does not cause the sun to rise nor the converse.  (*Id.* at p. 3.)  An
17  association is "nothing more than a temporal association between variables."  **Exh.**
18  **A** (Bal Dep. 30:23-25.)  "When you see an association, you cannot or should not
19  jump to a cause and effect relationship.  That requires more data."  (*Id.* at 32:8-12.)

---

evidence before causation can be inferred. (Resp. at p. 16.)  However, their cites to Dr. Bal do not support this assertion.  Moreover, Dr. Targownik's report explains that criteria are employed by epidemiologists "to determine whether an observational association is likely to represent causation . . . ."  (Master Dkt. 255-4, Targownik Rpt., p. 4.)

[8] Plaintiffs' attorneys in the Response, not their purported expert Dr. Bal, make this assertion about Dr. Targownik's work.  It is unquestionably an inadmissible lay opinion.

8
DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO
EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY
BAL, M.D., J.D., M.B.A.
Case No.  12-ml-2404 DSF (SSx)

### D. Plaintiffs' Response Fails To Address The Fundamental Underlying Analytical Gaps Which Render Dr. Bal's Opinion Unreliable.

None of the arguments set forth in Plaintiffs' Response demonstrate that Dr. Bal's opinion in this case should be deemed reliable under Rule 702 and *Daubert*.[9] To the contrary, there is too large of an analytical gap between the items he relies upon and the opinion he reaches.[10] In sum, the association studies he relies upon:

- do not agree that causation has been established,[11]
- are not on Nexium® – the only medication Dr. Bal implicates in his opinions, and
- at best speculate with regard to possible mechanisms of action.

Dr. Bal's opinion cannot reliably extend to a conclusion where the literature upon which he relies has not reached such a conclusion and he has done no independent research. Law is meant to lag science, not allow speculation to stand as science.

First, Plaintiffs assert that Dr. Bal should be able to rely upon studies that never studied Nexium®, or studied it only as part of a class of medications. (Resp. at pp. 11-12.) Whether or not it would be scientifically appropriate,[12] Dr. Bal has

---

[9] As proffered "scientific" evidence, Dr. Bal's opinion is subject to the *Daubert* factors as discussed in Defendants' opening brief. *Cf. United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (courts have "broad discretion" in reviewing proffered nonscientific, *i.e.*, *Kumho* expert evidence).

[10] Additionally, as discussed in the opening brief, Dr. Bal's opinion is driven by litigation. (Master Dkt. 255, pp. 18-19.) Plaintiffs do not address this argument. In the interest of brevity, Defendants therefore incorporate by reference their prior brief as it relates to this issue.

[11] Plaintiffs in their Response do not contest this point.

[12] Plaintiffs argue that because the FDA issued classwide PPI labeling for bone fracture, it would be reliable for Dr. Bal to rely on studies conducted on other PPIs. Setting aside that Dr. Bal precludes this methodology by contending there is no class-wide effect, the

9
DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY BAL, M.D., J.D., M.B.A.
Case No. 12-ml-2404 DSF (SSx)

decided that his opinion is not generalizable to other PPIs and, thus, he **only** opines that Nexium® is causally associated with OP. **Exh. A** (Bal Dep. 78:11-14, 121:23-122:25.) Relying on studies of other medications, therefore, admittedly is not supportive or reliable because it would be inconsistent with his opinion that it is not a class-wide effect. *Cf. Tucker*, 701 F. Supp. 2d at 1056 (allowing expert to rely upon studies of a class of medications, but no contention that expert himself did not know the medications to be sufficiently similar to treat as a class).

Next, Plaintiffs contend that because Dr. Bal necessarily limited his opinions to only certain fracture sites, it therefore must be reliable. (Resp. at p. 16.) Plaintiffs provide no support for the point that a narrow rather than broad opinion is necessarily more reliable. Regardless, Dr. Bal's posited opinion is that Nexium® causes osteoporosis and only "osteoporotic" fractures. However, the studies he relies upon did not find that PPIs were associated with a reduction in bone mineral density (BMD), *i.e.*, osteoporosis. **Exh. A** (Bal Dep. 148:15-149:9.)

Further, Plaintiffs contend that Dr. Bal implicitly applied the Bradford Hill criteria and therefore his opinion is more reliable. (Resp. at p. 17.) Nothing in Dr. Bal's report or deposition discloses that Dr. Bal used this or any other recognized methodology to assist in determining whether an observed association is causal. Rather, Plaintiffs in their Response **argue** that what they read about Dr. Bal's opinions seem to comport with Plaintiffs' interpretation of this epidemiologic

---

FDA label and communications regarding the label are not, in themselves, any evidence of causation. Federal regulations make clear that a "causal relationship need not have been proved" for a warning to issue. 21 C.F.R. § 201.57(e). Furthermore, the FDA language at issue does not assert or imply an established causation ("The available data . . . suggest a **possible** increased risk of fractures of the hip, wrist, and spine. . . . [T]here is uncertainty about the magnitude of this risk."). (Master Dkt. 288-3, Exh. J.) (emphasis added).

criteria. Regardless of whether Dr. Bal would be competent to apply the criteria (which Defendants deny), Plaintiffs and their counsel undoubtedly are not. Moreover, the cites to Dr. Bal's deposition transcript do not relate to the Bradford Hill criteria that Plaintiffs cite: temporality, strength of association, alternative explanations, consistency or biologic plausibility. (*See* Resp., p. 17, cited Bal Dep.)[13] The only disclosed expert to engage in this analysis was the gastroepidemiologist Dr. Targownik. (Master Dkt. 255-4, Targownik Rpt., pp. 4-9.) She was explicit in use of the methodology and concluded that application of the criteria did not imply a causal relationship. (*Id.* at p. 9.)

Finally, Plaintiffs argue that lack of an "established" mechanism of action and the presence of Defendants' own experts cannot *ipso facto* make their expert inadmissible. Plaintiffs misunderstand the significance of these issues. As to the lack of accepted mechanism of action, such missing evidence is "significant" if not dispositive to a *Daubert* analysis as to whether the expert's opinion is reliable. *Schudel v. Gen. Elec. Co.*, 120 F.3d 991, 997 (9th Cir. 1997). Additionally, as addressed above, Plaintiffs contend that causation may be "implied" from the items Dr. Bal relies upon which include his opinions regarding a "plausible", but not "established," mechanism of action. However, *Tucker*, *supra*, does not support reliance upon a merely "plausible" mechanism of action. Rather, the mechanism must be "accepted," a difference that Dr. Bal appears to understand. **Exh. A** (Bal Dep. 106:25-107:10) (stating that he did not recall "any accepted or recognized"

---

[13] For example, Bal Dep. 73:8-13 (which was cited for alternative explanations, consistency with scientific knowledge and biologic plausibility) states nothing more than how Nexium® works: Q. Do you know the clinical pharmacology is by which proton pump inhibitors work? A. Yeah. They decrease the secretion of acids and quite dramatically in the stomach. **Exh. A** (Bal Dep. 73:8-13.)

11
DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO
EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY
BAL, M.D., J.D., M.B.A.
Case No. 12-ml-2404 DSF (SSx)

mechanism by which Fosamax® could cause fractures.)

Additionally, Defendants' expert reports are not offered, as Plaintiffs' contend, as direct evidence that Plaintiffs' expert is inadmissible.[14] Rather, they are offered to demonstrate, based on good science, that there is no causal connection between treatment with Nexium and loss of bone density leading to possible fractures. Plaintiffs' fear that their purpose is instead to attack Dr. Bal's opinions merely highlights that his opinions cannot withstand any measure of valid scientific scrutiny. Finally, Defendants' expert reports address gaps in Dr. Bal's analysis regarding, *inter alia* whether calcium absorption has ever been studied in PPI users – given that Dr. Bal declined to undertake that research despite it being central to his opinions and made available to him through Defendants' expert reports. **Exh. A** (Bal Dep. 138:14-139:14.)

### III. CONCLUSION

FED. R. EVID. 702 and *Daubert* demand scrutiny of experts. The old refrain of allowing the jury to sort it out has ended. An admissible expert must be qualified and his testimony must be relevant and reliable. Dr. Bal does not meet any of these requirements and his testimony must be excluded.

---

[14] Plaintiffs cite *Hangarter v. Provident Life and Acc. Ins. Co.* for the point that competing expert opinions go to the weight, rather than the admissibility of evidence. (Resp. at p. 18 n.14.) However, *Hangarter* does not address the issue, but rather whether an expert's selection of documents is a *Daubert* issue. 373 F.3d 998, n.14 (9th Cir. 2004).

| | |
|---|---|
| DATED: May 22, 2014 | ICE MILLER LLP |
| | By: /s/ *Katherine A. Winchester*<br>AMY K. FISHER<br>BONNIE L. GALLIVAN<br>KATHERINE A. WINCHESTER<br>AUDRA J. FERGUSON-ALLEN |
| | JAMES FREEBERY<br>  jfreebery@mccarter.com<br>MAKENZIE WINDFELDER<br>  mwindfelder@mccarter.com<br>McCarter & English<br>Renaissance Centre<br>405 N. King Street, 8th Floor<br>Wilmington, DE  19801<br>Telephone: 302-984-6300 |
| | PETER A. STROTZ, BAR NO. 129904<br>  pstrotz@kslaw.com<br>WILLIAM E. STEIMLE, BAR NO. 203426<br>  wsteimle@kslaw.com<br>MEGAN R. NISHIKAWA, BAR NO. 271670<br>  mnishikawa@kslaw.com<br>King & Spalding LLP<br>101 Second Street<br>Suite 2300<br>San Francisco, CA  94105<br>Telephone:  +1 415 318 1200<br>Facsimile:  +1 415 318 1300 |
| | Attorneys for Defendants ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA LP, and MCKESSON CORPORATION |

# CERTIFICATE OF SERVICE

I, Katherine A. Winchester, declare:

I am a citizen of the United States and employed in Indianapolis, Indiana. I am over the age of eighteen years and not a party to the within-entitled action. My business address is One American Square, Suite 2900, Indianapolis, Indiana 46282.

On May 22, 2014, I served a copy of the within document(s):

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERT B. SONNY BAL, M.D., J.D., M.B.A.**

On all parties in this action by causing a true copy thereof to be distributed as follows:

☒ BY ELECTRONIC SERVICE VIA PACER: I caused such documents to be transmitted via electronic mail to the stated parties via an electronic service known as PACER.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 22, 2014, at Indianapolis, Indiana.

      /s/ *Katherine A. Winchester*
      KATHERINE A. WINCHESTER